# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

GREAT AMERICAN INSURANCE
COMPANY,
*as subrogee for Vectren Corporation,*

    Plaintiff,

    v.

NEXTDAY NETWORK HARDWARE
CORP.,
DONALD BANYONG,
ANTHONY NGO, and
JOHN/JANE DOES, *1 through 10,*

    Defendants.

Civil Action No. TDC-14-1451

## MEMORANDUM OPINION

From December 2011 until November 2012, Defendant NextDay Network Hardware Corporation ("NextDay") purchased hundreds of thousands of dollars' worth of information technology equipment from an individual who stole the equipment from his employer, Vectren Corporation ("Vectren"). Plaintiff Great American Insurance Company ("GAIC"), Vectren's insurer, filed suit against NextDay; Donald Banyong, the president and chief executive officer of NextDay; and Anthony Ngo, a NextDay employee (collectively, "Defendants"). The Amended Complaint asserts claims for conversion, aiding and abetting conversion, and civil conspiracy. Presently pending is Defendants' Motion for Leave to File an Amended Answer, Defendants' Motion for Summary Judgment, and GAIC's Cross-Motion for Summary Judgment. A hearing on the pending motions was held on February 23, 2016, and they are now ripe for disposition. For the reasons set forth below, Defendants' Motion for Leave to File an Amended Answer is

GRANTED; Defendants' Motion for Summary Judgment is DENIED; and GAIC's Motion for Summary Judgment is GRANTED.

## BACKGROUND

### I.     Theft from Vectren

On December 8, 2011, Vectren, an Indiana-based energy holding company, hired Christopher Brian Crowe as an Associate Network and Telecommunications Analyst.   By November 6, 2012, Vectren discovered that Crowe had likely been stealing computer networking equipment from its facilities.   Vectren reported this information to the police department in Evansville, Indiana on November 9, 2012.   On November 12, 2012, the Evansville Police Department ("EPD") arrested Crowe and Vectren terminated him.   On May 29, 2014, Crowe pleaded guilty to theft in the Superior Court of Vanderburgh County, Indiana, was sentenced to four years of imprisonment with the Indiana Department of Corrections, and was ordered to pay $669,338.05 in restitution.   All told, Vectren had paid approximately $915,733 for the equipment Crowe stole.

### II.    NextDay

Crowe sold the vast majority of this equipment on eBay to NextDay, an S corporation based in Silver Spring, Maryland.   Banyong was one of two incorporators and original directors of NextDay.   At the time of incorporation, NextDay had approximately three employees. NextDay resells computer networking servers and peripheral equipment and provides consulting services to small and medium-sized businesses relating to Cisco WAN, LAN, and Wi-Fi technologies.   It is a member of the United Network Equipment Dealers Association, a trade organization for national and international network equipment sellers.

The market for resale of Cisco equipment is roughly divided into two types of resellers: authorized and unauthorized. Authorized resellers obtain their products directly from Cisco or an authorized dealer and can sell them with a Cisco warranty. One such company is Bytes Solutions, Inc., which is entirely owned by Banyong. NextDay, by contrast, is an unauthorized reseller, a legitimate enterprise that purchases Cisco products from the "gray market," or third-party sources. The two companies are linked in that Bytes Solutions and NextDay share physical space, and Bytes Solutions handles payroll and other administrative functions for both companies. NextDay and Bytes Solution, together, provide the means by which Banyong can purchase equipment both from the gray market and directly from Cisco.

### III.    Resale to NextDay

Anthony Ngo has worked for NextDay since 2008. Ngo purchases Cisco equipment for NextDay from the gray market, including the equipment in question in this case. Banyong taught Ngo, an expert on Cisco equipment, how to purchase equipment pursuant to company parameters and guidelines.

One day in December 2011, one of Crowe's eBay auctions caught Ngo's eye. After seeing that Crowe had "favorable ratings," Ngo contacted Crowe directly. Defs.' Mot. Summ. J. ("Defs.' Mot."), Ngo Aff. ¶ 4, ECF No. 31-3. So began NextDay's business relationship with Crowe. Between December 28, 2011 and November 8, 2012, Ngo directly purchased from Crowe, on behalf of NextDay, approximately 468 items for a total cost of $228,609.15. Some of the payments were made through a PayPal.com account, while others were made with company checks. At one point, Ngo wrote to Crowe that he was "interested in anything Cisco" such that

3

"[i]f it says [Cisco], unless it is really old, we will buy it." Pl.'s Cross-Mot. Summ. J. ("Pl.'s Cross-Mot."), Crowe E-mails at 1, ECF No. 32-19.[1]

Ngo has stated that he noticed "no indications that the items purchased from Crowe were stolen" and that his "extensive experience of buying large scale computer equipment online for the purpose of reselling such items" led him to believe that "Crowe's selling prices were comparable to other sellers of the same equipment." Ngo Aff. ¶ 6. He also did not believe that Crowe selling as an individual online was unusual.

For his part, Banyong has stated that he "never had any contact with Mr. Crowe, in any shape or form, either directly or indirectly" and that "the only individual at [NextDay] that had any significant contact with Christopher Crowe was Mr. Anthony Ngo." Defs.' Mot., Banyong Decl. ¶¶ 8–9, ECF No. 31-2. According to Ngo, he had the authority to make purchases without specific approval from Banyong, and Banyong did not give him any "guidelines" for his transactions with Crowe. Pl.'s Cross-Mot., Ngo Dep. at 36, ECF No. 32-7. However, on May 21, 2012, a PayPal account under the name of "Donald Banyong" initiated a dispute with Crowe based on the failure to receive a purchased item that cost $1,600. Pl.'s Cross-Mot., PayPal Dispute at 1, ECF No. 32-20. Then, during a June 14, 2012 purchase from Crowe, Ngo told Crowe that he had to receive approval from his "boss" to agree to a higher purchase price. Crowe E-mails at 1. Ngo has since acknowledged that Banyong was "the boss." Ngo Dep. at 25–26. After Crowe acknowledged Ngo's e-mail, Ngo reiterated, "I will run it by him real quick. Please 30 mins." Crowe E-mails at 3. Ngo responded approximately one hour later by writing, "We're good to go." *Id.* at 1.

---

[1]  Citations are to the page numbers in the original documents. When exhibits do not have page numbers, or contain multiple sets of page numbers, citations are to the page numbers assigned by the Court's CM/ECF system.

## IV.    NextDay's Sale of Known Stolen Goods

In November 2012, EPD Detective Stacy Spalding informed Banyong that the property sold by Crowe had been stolen.  On December 11, 2012, Detective Spalding sent a subpoena for records relating to the purchases, to which NextDay responded by providing electronic records. On March 12, 2013, Banyong wrote to Detective Spalding that "we are going to be selling the rest of the items which we purchased from Chris Crowe."  Pl.'s Cross-Mot., Sale E-mails at 1, ECF No. 32-26.  On March 13, Detective Spalding wrote back:

> I have spoken with a representative of Vectren who are the victims of the crime. They would like to have the items that have not been sold returned to them.  I believe they have an obligation to mitigate any restitution that the defendant will ultimately be responsible for paying back.  Let me know in what way the Evansville Police Department can facilitate the transfer.

*Id.* at 2.  Instead of returning the items, Banyong wrote back:

> Restitution goes both ways; as you know we paid for those items as well.  I am more concern[ed] about your investigation than Vectren.  Legally, we have no obligation to return equipment which we purchased from a third party to Vectren.

*Id.*  Banyong then took the position that NextDay would only return the items if EPD needed them as evidence.  Although Vectren continued to tell the EPD that it wanted the property returned, EPD advised that the legal process to compel the return would be difficult.  Believing that the EPD did not have jurisdiction over a Maryland company to demand the return of the property, Detective Spalding responded, "We will not seek its return unless it is something you are willing to do."  Sale E-mails at 1.  When Detective Spalding confirmed that the property was not needed as evidence, Banyong instructed NextDay personnel, "You can sell the items from Chris Crowe."  *Id.*  According to Banyong, there were approximately six stolen items out of the 468 purchased from Crowe that remained at NextDay when he learned that they were stolen.

5

## V.   Damages

On February 13, 2013, Vectren submitted to GAIC a claim of $915,733 for the stolen equipment.  GAIC then retained SDC CPAs, LLC ("SDC") to assist in "ascertaining pertinent facts surrounding the claimed loss, detailing and verifying the documentation and information provided by the various parties, and determining whether there is a loss addressed by the policy." Pl.'s Cross-Mot., SDC Report at 1, ECF No. 32-32.  On May 8, 2013, SDC issued a report confirming Vectren's valuation of its claim, which GAIC uses as the basis for the damages it seeks in this case.  SDC's confirmation of Vectren's valuation was a two-step process.  First, using the EPD Investigation Report and NextDay's records, SDC compared the equipment Vectren claimed was missing to the equipment Crowe sold on eBay.  Second, if the claimed equipment matched up, SDC valued the property at the prices listed in Vectren's original purchase invoices.  Most of the equipment had invoices because Vectren purchased them shortly before Crowe sold them.  SDC did not account for any depreciation in value between when Vectren bought the equipment and when Crowe sold it on eBay because most of the items were sold within a year, and in some cases within one week.  For instance, $653,825 of the claim consisted of equipment ordered by other Vectren employees that Crowe was supposed to inventory but instead stole.  $209,307 of the claim consisted of equipment Crowe verbally ordered without authorization and then stolen when it was delivered.  For the few items that had no invoices or were too old for Vectren to claim any value, SDC valued them "based on fair market value of what others are willing to pay on eBay." *Id.* at 7.  This category of items amounted to $3,604.99.  Finally, SDC applied Indiana's seven percent sales tax to its valuation.

NextDay named its own expert on damages, but it has not submitted any affidavit from the expert or any alternative calculation of damages.  The only evidence offered by NextDay is

6

an August 2015 printout of the price on eBay of certain items similar to those stolen and sold by Crowe.

On June 10, 2013, GAIC paid Vectren $669,338.05, which accounted for SDC's valuation of the stolen items minus a $250,000 deductible.  On August 4, 2014, Vectren transferred to GAIC "all of its claims, demands, causes of actions, and suits . . . arising out of the dishonest acts for which this claim was made" against Vectren employees and "all persons and/or entities that may have participated, been involved in, or [are] liable for any of the losses suffered by the Insured based on the Claim."  Pl.'s Cross-Mot., Subrogation Agreement, ECF No. 32-37.  GAIC exercised this right when it filed its Complaint on April 30, 2014.

## DISCUSSION

### I.   Defendants' Motion for Leave to File an Amended Answer

On October 1, 2015 the Court granted GAIC's Motion for Leave to File an Amended Complaint.  On October 9, 2015, Defendants then filed a Motion for Leave to File an Amended Answer.   On October 19, 2015, GAIC filed its Memorandum of Law in Opposition to Defendants' Motion for Leave to Amend Their Answer, arguing that Defendants' Motion was prejudicial and futile and lacked good cause.   Under the Federal Rules of Civil Procedure, district courts "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Because the Court permitted GAIC to amend its Complaint, it will likewise permit Defendants to amend their Answer.  Accordingly, the Motion for Leave to File an Amended Answer is granted.

### II.   Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

As stated in the Court's December 23, 2014 Memorandum Opinion, this case is governed by Maryland law.

## III.   Defendants' Motion for Summary Judgment

In its Motion, NextDay argues that summary judgment should be granted against GAIC on its claims for conversion, aiding and abetting conversion, and civil conspiracy to commit conversion. For the following reasons, these arguments are without merit or moot.

### A.   Constructive Conversion

Defendants argue that they are entitled to summary judgment on GAIC's cause of action for conversion because the claim is one of constructive conversion, and the elements of constructive conversion have not been established. A constructive conversion arises "where the possession of the defendant, in the first instance, was rightful; as, for example, where he actually found the goods in question, or acquired possession of them lawfully from the plaintiff or from a

third person for a limited time or a special purpose." *Mattingly v. Mattingly*, 133 A. 625, 626 (1926); *see also K & K Mgmt. v. Lee*, 557 A.2d 965, 983 (Md. 1989) ("Constructive conversion is predicated on possession by the defendant that was initially lawful or rightful."). An example would be if the plaintiff initially loaned the property to the defendant then later sought its return. In such cases, the defendant is liable only if the plaintiff previously demanded that the property be returned but the defendant refused. *See K & K Mgmt.*, 557 A.2d at 983. Defendants argue that their purchase of the goods was rightful because they did not know at the time that the goods were stolen, that the transfer was therefore a constructive conversion, and that GAIC's conversion claim fails because Vectren never made a formal demand for the return of its property.

Defendants' argument fails because this was not a case of constructive conversion. If a defendant takes possession of property with "no legal justification" or without "any possessory interest in the property," there is a direct conversion, and no demand and refusal of the demand are required to establish conversion. *Id.* It is firmly established that receiving stolen goods is not a lawful or rightful taking. "A purchaser of stolen goods or an auctioneer who sells them in the utmost good faith becomes a converter." *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 208 (Md. 1985) (quoting W. Page Keeton *et al.*, *Prosser & Keeton on Torts* § 15 (5th ed. 1984)). The only intent required for such direct conversion is exercising "dominion or control" over the property that is inconsistent with the plaintiff's rights; "[a] mistake of law or fact is no defense." *Id.*; *Levi v. Booth*, 58 Md. 305, 318 (1882) (finding that "it is a settled principle, that if there has been what amounts in law to a conversion of the plaintiff's goods, by any one, however innocent, that person will be liable for the value of the goods to the real owner").

In *Inmi-Etti v. Aluisi*, 492 A.2d 917 (Md. Ct. Spec. App. 1985), the court held that a car dealer was liable for conversion when it purchased a car from an individual who, taking advantage of the true owner's absence from the country, had falsely claimed to have been awarded the car in a court proceeding and thereby obtained a certificate of title for the car. *Id.* at 919. Unlike someone who has "voidable title" to property, which is obtained when the true owner voluntarily transfers the property to that individual, the seller had "void" title because the owner had never voluntarily transferred the car to him. *Id.* at 923–24. In finding that the car dealer was therefore liable for conversion, the court stated:

> One receiving a chattel from a third person with intent to acquire a proprietary interest in it is liable *without a demand for its return* by the person entitled to possession, although he takes possession of the chattel without knowledge or reason to know that the third person has no power to transfer the proprietary interest. The mere receipt of the possession of the goods under such circumstances is a conversion.

*Id.* at 924 (quoting *Restatement (Second) of Torts* § 299 cmt. e. (Am. Law Inst. 1965)) (emphasis added). By noting that no demand for return is necessary to establish conversion under these circumstances, the court necessarily concluded that the transfer of property with void title is a direct conversion, not a constructive conversion. Thus, the difference between direct and constructive conversion does not turn on whether the defendant *knew* the goods were unlawfully obtained, but *whether* they were unlawfully obtained.

In this case, there is no dispute that Crowe stole the equipment that NextDay purchased and resold. Because the equipment was originally stolen, and not lawfully obtained, Crowe had "void title." *Id.* at 921 ("A thief, for example, 'gets' only void title and without more cannot pass any title to a good faith purchaser."). Even if NextDay, like the car dealer in *Inmi-Etti*, had no knowledge that the seller had no valid right to the property, the transfer of the property would be a direct conversion. *See id.* at 924; *Keys*, 494 A.2d at 208. Accordingly, Defendants' argument

10

that they are entitled to summary judgment because they received no formal demand for the return of the property necessarily fails.

### B.      Aiding and Abetting and Civil Conspiracy

In its Cross-Motion for Summary Judgment, GAIC states that "because the undisputed material facts establish Defendants' liability for conversion, GAIC's causes of action for aiding and abetting and civil conspiracy are moot." Pl.'s Cross-Mot. at 32. Because, as discussed below, Defendants are directly liable for conversion, GAIC is correct that Counts III (Aiding and Abetting) and IV (Civil Conspiracy) of the Amended Complaint are moot. Therefore, the Court will not address these claims.

### IV.     GAIC's Cross-Motion for Summary Judgment

In response to Defendants' Motion for Summary Judgment, GAIC has filed a Cross-Motion for Summary Judgment, arguing that it is a valid subrogee, that NextDay, Banyong, and Ngo are jointly and severally liable for conversion, and that it is entitled to damages in the amount of $669,338.05, less any amount already recovered from Crowe. Defendants do not dispute, and the Subrogation Agreement clearly states, that GAIC is a valid subrogee. The Court therefore addresses whether GAIC is entitled to summary judgment on liability against NextDay, Banyong, and Ngo, and on damages in the amount requested.

### A.      Conversion

Under Maryland law, conversion involves any distinct act of dominion or control "'exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 963 (Md. 1999) (quoting *Interstate Ins. Co. v. Logan*, 109 A.2d 904, 907 (Md. 1954)). Conversion can occur "either by

initially acquiring the property or by retaining it longer than the rightful possessor permits." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.3d 828, 835 (Md. 2004).

There is no dispute that NextDay exercised dominion and control over stolen property that belonged to Vectren. As discussed above, it does not matter whether NextDay had knowledge that the property was stolen. *Keys*, 494 A.2d at 208 ("A purchaser of stolen goods or an auctioneer who sells them in the utmost good faith becomes a converter."). "A defendant is liable nonetheless for conversion, if he, she, or it acted in good faith and lacked any consciousness of wrongdoing, as long as the act is an interference with the owner's control of the property." *Nickens v. Mount Vernon Realty Group, LLC*, 54 A.3d 742, 757 (Md. 2012) (internal quotation marks omitted). A mistake of fact on whether Crowe had rightful ownership is not a defense. *See Keys*, 494 A.2d at 208. The only intent required for conversion is the intent to exercise "dominion or control" over the property which is in fact inconsistent with the plaintiff's rights. *Id.*; *Nickens*, 54 A.3d at 757. Thus, where it is undisputed that NextDay intentionally acquired the property from Crowe and exercised control over it before reselling it, there is no genuine issue of material fact on whether NextDay is liable for conversion. The Court therefore grants summary judgment to GAIC on the conversion claim against NextDay. *See Inmi-Etti*, 492 A.2d at 924 (granting summary judgment on conversion against a car dealer which purchased a car without knowledge that the seller was not the true owner, even though the seller had obtained a certificate of title in his name).

GAIC also seeks summary judgment on conversion against Banyong and Ngo because they had a personal role in the conversion. "[C]orporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body." *Tedrow v. Deskin*, 290 A.2d 799, 802 (Md. 1972).

In a corporate setting, "[a]n individual may also be liable . . . when he or she is present on a daily basis during commission of the tort and gives direct orders that cause commission of the tort." *Allen v. Dackman*, 991 A.2d 1216, 1228 (Md. 2010). Conversely, "[i]f the officer takes no part in the commission of the tort committed by the corporation, he is not personally liable therefor unless he specifically directed the particular act to be done, or participated or cooperated therein." *Tedrow*, 290 A.2d at 802.

There is no dispute that Ngo was the employee of NextDay who corresponded with Crowe, negotiated the purchase of the stolen goods, and completed the transactions. Although Ngo was acting on behalf of NextDay, because he was an agent of NextDay and personally committed the acts of conversion by acquiring the stolen property, he is also liable for conversion. *See id.*

Banyong is also personally liable for conversion. Banyong asserts that he never interacted with Crowe in any way. There is uncontroverted evidence, however, that Banyong personally directed the sale of stolen goods after he was aware that they had been stolen. Banyong has acknowledged that he learned in November 2012 that the goods purchased from Crowe were stolen. Despite that knowledge, on March 12, 2013, Banyong wrote to Detective Spalding that "we are going to be selling the rest of the items which we purchased from Chris Crowe." Sale E-mails at 3. When Detective Spalding wrote back that Vectren "would like to have the items that have not been sold returned to them" to meet their obligation to mitigate the amount of restitution that Crowe would owe," Banyong responded not by agreeing to return the stolen property, but by stating, "[r]estitution goes both ways; as you know we paid for those items as well" and taking the position that NextDay would only release the items if they were needed as evidence. *Id.* at 2. When Detective Spalding acknowledged that the property was not

needed as evidence, Banyong instructed NextDay personnel, "You can sell the items from Chris Crowe." *Id.* at 1. Having personally made the decision to continue to deprive the rightful owner of its stolen property by selling the goods rather than returning them, Banyong indisputably participated in NextDay's conversion against Vectren by "retaining it longer than the rightful possessor permits." *Darcars Motors*, 841 A.3d at 835. Based on this evidence alone, GAIC is entitled to summary judgment against Banyong on the conversion claim.[2]

There is also uncontroverted evidence that Banyong contemporaneously approved at least one of the purchases from Crowe. In a June 14, 2012 e-mail exchange with Crowe, Ngo suggested that NextDay would agree to pay an additional $100 for two pieces of equipment and said, "Let me know and I will confirm with my boss I can do so." Crowe E-mails at 1. At his deposition, Ngo indicated that Banyong was his "boss." Ngo Dep. at 25–26. After Crowe agreed to that price, Ngo wrote, "I will run it by him real quick. Please 30 mins." Crowe E-mails at 3. Then, approximately one hour later, Ngo wrote to Crowe, "We are good to go." *Id.* Although Ngo has stated that he was not required to secure approval from Banyong on individual transactions, neither Banyong nor Ngo has asserted that Banyong never approved any of the Crowe transactions, or that he did not approve this particular transaction. Defendants' claim that Ngo would sometimes reference his boss as a negotiating tactic is unsupported by the portion of the record cited in their brief for this proposition and, in any event, is unconvincing given the multiple emails reporting on his efforts to secure approval of that transaction. This exchange therefore further establishes that Banyong is liable for conversion because he participated in "initially acquiring the property." *Darcars Motors*, 841 A.3d at 835. It is also noteworthy that

---

[2]   The Court notes that if the items sold after this March 12, 2013 e-mail exchange were valued at more than $5,000 and were sold to individuals or entities outside of Maryland, it would appear that Banyong's conduct satisfied the elements of the federal crime of interstate transportation of stolen property. *See* 18 U.S.C. § 2314 (2012).

the PayPal account used to pay Crowe was in the name of "Donald Banyong," not NextDay. PayPal Dispute at 1.

When this evidence is considered together, no reasonable jury could conclude that Banyong had not "participated" in the conversion. *See Tedrow*, 290 A.2d at 802. GAIC is therefore entitled to summary judgment against Banyong on the conversion claim. NextDay, Banyong, and Ngo are jointly and severally liable on this claim. *See Zeman v. Lotus Heart, Inc.*, 717 F. Supp. 373, 375 (D. Md. 1989) (stating that "agents and employees of a corporation may become jointly and severally liable with the corporation for torts committed by them while in the scope of service to the corporation"); *cf. Southern Mgmt. Corp. v. Taha*, 836 A.2d 627, 638 (Md. 2003) (holding that if a corporate officer or agent commits a tort within the scope of employment, the "employer will be held jointly and severally liable for the tortious acts committed by its employee").

Because the Court grants summary judgment on conversion against all Defendants, it need not address GAIC's arguments that there are genuine issues of material fact relating to the aiding and abetting conversion and civil conspiracy counts.

**B.    Damages**

Finally, GAIC argues that summary judgment should be awarded in its favor on the issue of damages. "The measure of damages in an action for conversion of personal property is the fair market value of the property at the time of conversion, with legal interest thereon to the date of the verdict." *Keys*, 494 A.2d at 209. If there is no genuine issue of material fact, summary judgment may be awarded on damages. *See Pine Ridge Coal Co. v. Local 837, United Mine Workers*, 187 F.3d 415, 422 (4th Cir. 1999). When a party seeking summary judgment on damages has offered evidence to establish the amount of damages, the nonmoving party must

either offer its own evidence to establish a genuine issue of material fact on the amount of damages, or provide an affidavit with a justification for the failure to do so, such as a justifiable need for additional discovery. *Id.* at 421–22; *see also* Fed. R. Civ. P. 56(c).

In this case, GAIC has submitted a damages calculation based on the SDC Report. The report calculates the fair market value to be $915,733.06. This figure was arrived at by matching specific items sold by Crowe to NextDay, as reflected in NextDay's records, with invoices showing how much Vectren paid for those items. The figure also includes $3,605 for a handful of items that were already used at the time of the theft, which was calculated by taking the sales prices that Crowe was able to obtain on eBay.

Defendants argue that summary judgment should not be awarded on damages because GAIC's calculation does not reflect the fair market value of the equipment. They argue that SDC never verified that the information it was relying on was truthful or accurate, SDC did not take into account the depreciation in value of the stolen goods as of the time that NextDay bought them, SDC did not account for the effect of the gray market on the fair market value of the equipment, and the calculation does not reflect the "specific facts of this case." Defs.' Opp'n Cross-Mot. Summ. J. ("Defs.' Opp'n") at 11–12. Defendants' arguments fail for two reasons.

First, SDC's methodology was legally and factually appropriate. In a case involving conversion of goods that were later sold at "fire sale" prices, it is proper to calculate fair market value based on the prices reflected in actual invoices, not the significantly reduced prices at which they were sold as part of the conversion, such as gray market prices. *See Transpacific Tire & Wheel, Inc.*, No. DKC-2006-0187, 2010 WL 1375292, at *12–13 (D. Md. Mar. 30, 2010). Even though the tires in *Transpacific* remained in inventory for some time, there was no discount applied to the invoice prices. *See id.* In this instance, Crowe's scheme was to steal new, unused

16

equipment, either by placing unauthorized orders and intercepting the product upon arrival at Vectren, stealing new equipment ordered to upgrade networks, or stealing spare equipment in inventory. All of the equipment valued at the invoice price was recently purchased by Vectren, had never been used, and was less than a year old—in some cases only a week old—at the time of resale. The limited number of older, used items was valued at the price the equipment could be sold for on eBay. Under these circumstances, SDC's methodology, which was verifiable based on actual documentation, was legally and factually sound.

Second, Defendants have presented no evidence to create a genuine issue of material fact on the amount of damages. To challenge GAIC's damages claim, Defendants have provided only a letter identifying a damages expert, without any affidavit or even a summary of his expected testimony, and an August 2015 printout from eBay showing the cost of a few items similar to the stolen items. The letter, which makes no attempt to calculate damages, and the eBay printout, which is not even from the relevant time period, do not contradict GAIC's calculation of damages. *See Pine Ridge Coal Co.*, 187 F.3d at 422 (granting summary judgment on damages where the nonmoving party offered no alternate calculations). Stating in conclusory fashion that "it is inequitable to hold NextDay liable for GAIC's entire loss based on the specific facts of this case," Defs.' Opp'n at 12, and challenging SDC's computation of damages without pointing to tangible evidence of its inaccuracy, is insufficient to raise a genuine issue of material fact. *See Pine Ridge Coal*, 187 F.3d at 422.

Defendants further argue that damages should be mitigated because Vectren had actual knowledge of the stolen equipment for at least four months before Crowe was arrested and did not file a claim with GAIC within 120 days of discovering the theft, as required by the insurance policy. This argument derives from Vectren's Draft Investigative Report, which indicates that a

Vectren employee first noticed missing equipment on July 25, 2012. In response to that discovery, Vectren's manager of IT infrastructure conducted an internal investigation over several months, which included reviewing asset logs and alerts for two different locations and enlisting assistance from the security department to review employee badge access logs. On November 1, 2012, once the investigation pointed to Crowe as a suspect, the IT manager reported that suspicion up the chain of command. With that name, Vectren was able to identify suspicious orders placed by Crowe. On November 7, 2012, Crowe was questioned about the missing equipment and placed on paid suspension. Two days later, on November 9, 2012, Vectren notified the EPD. On November 12, 2012, the EPC arrested Crowe, and Vectren terminated him. That month, the EPD notified Banyong that the items it purchased from Crowe were stolen. Once EPD obtained from NextDay, in January 2013, a list of equipment Crowe sold to NextDay, Vectren was able to assess and calculate the loss and submit its claim to GAIC on February 12, 2013.

Nothing about this timeline suggests that Vectren had unreasonably delayed in notifying law enforcement or submitting its claim to GAIC. An initial discovery of missing equipment does not establish a loss. Vectren necessarily had to conduct an internal investigation to determine whether the missing equipment was never ordered, placed into use without documentation, misplaced within the company, or stolen. It could not stop the thefts until it identified the perpetrator, which required further investigation. The undisputed timeline of events demonstrates that Vectren acted with due diligence in making this determination and notifying the appropriate authorities. Significantly, even though NextDay was notified that it had purchased stolen goods in November 2012, it exacerbated the damages by refusing to return

the remaining stolen equipment and instead selling it against Vectren's wishes. Defendants' argument for failure to mitigate damages is without merit.

Finally, Defendants argue that GAIC's requested damages award of $669,338.05 conflicts with a $520,981.05 Agreed Judgment Entry entered against Crowe and in favor of GAIC on September 26, 2014 by Judge David D. Kiely of the Vanderburgh Circuit Court in Vanderburgh County, Indiana. This civil judgment originated from a $669,338.05 criminal Restitution Order entered by Judge Robert J. Pigman of the Vanderburgh Superior Court on June 13, 2014 in the criminal case against Crowe. In converting that criminal restitution order into an enforceable civil judgment for the benefit of GAIC, Judge Kiely reduced the amount by $148,357.

Although the record does not contain an explicit explanation for this reduction, $54,377 of that amount consists of payments received from Crowe before the Agreed Judgment Entry. As of June 13, 2014, the date the Restitution Order was entered, Crowe had paid $51,827 in restitution. Crowe later made an additional $2,550 in payments, bringing the total restitution paid to $54,377. As discussed below, GAIC has agreed that its damages award should be reduced by any payments on the Restitution Order or Agreed Judgment Entry by Crowe.

The remaining reduction of $93,980 appears to match the value of stolen items recovered from Crowe and returned to Vectren by the EPD, which, according to the SDC Report, amounted to $93,981. Although Judge Kiely appears to have credited Crowe with this amount, those items were returned *before* SDC performed its damages calculations, so SDC's calculation of a loss amount, on which GAIC's payment to Vectren of $669,338.05 was based, already included a credit for the $93,981 in returned items. Because GAIC did not actually receive the value of

19

those items to offset the $669,338.05 that it paid to Vectren under the insurance policy, the $520,981.05 Agreed Judgment Entry figure does not represent the uncompensated loss to GAIC.

In light of the SDC Report that GAIC submitted to support this valuation, which Defendants do not contradict with relevant evidence of their own, summary judgment on damages is awarded against Defendants. Although the fair market value of the stolen goods was $915,733.06, GAIC seeks from Defendants only $669,338.05, the amount it paid Vectren under its insurance policy, consisting of the $915,733.06 less the $250,000 deductible. GAIC has further agreed that any damages award should be reduced by the amount that Crowe has already paid pursuant to his criminal restitution order. In addition to the $54,377 already discussed, GAIC has also received the following additional payments: (1) in December 2014, GAIC received $817.50 from the proceeds of an auction of Crowe's personal property; and (2) by January 2016, GAIC had received $19,716 from the sale of Crowe's car. Although these payments by Crowe add up to $74,910.50 already recovered by GAIC, at the February 23, 2016 hearing, counsel for GAIC represented that a total of $75,890.50 had been paid in restitution as of February 22, 2016. The $669,338.05 loss amount is thus reduced by $75,890.50, for a total damages award of $593,447.55.

Prejudgment interest is awarded at the legal rate in Maryland of six percent and is calculated from June 10, 2013, the date GAIC paid Vectren. *Saunders v. Mullinix*, 72 A.2d 720, 722 (Md. 1950) (holding that damages on a conversion claim are the fair market value of the property at the time of conversion and legal interest from the time of conversion to the date of the verdict); *Buxton v. Buxton*, 770 A.2d 152, 165 (Md. 2001) ("Prejudgment interest has been held a matter of right as well in conversion cases where the value of the chattel converted is readily ascertainable."); Md. Const., art. III, § 57 ("The Legal Rate of interest shall be six percent

per annum, unless otherwise provided by the General Assembly."); *see also Crystal v. West &*
*Callahan, Inc.,* 614 A.2d 560, 572 (Md. 1992) ("Absent statute, the legal rate of prejudgment
interest is equal to the general legal rate of six percent").  Post-judgment interest is mandated by
28 U.S.C. § 1961 and will not be separately awarded.

Because NextDay, Banyong, and Ngo are joint tortfeasors who acted in concert, each of
them is jointly and severally liable for the entire damages amount, "regardless of whether the
conduct of one directly caused more or less injury compared to that of another, because they
acted together with a common purpose resulting in responsibility for the common injury." *See*
*Mercy Medical Ctr. v. Julian,* 56 A.3d 147, 150 (Md. 2012); *Consumer Protection Div. v.*
*Morgan,* 874 A.2d 919, 950 (Md. 2005).

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Leave to File an Amended Answer is
GRANTED, Defendants' Motion for Summary Judgment is DENIED, and GAIC's Cross-
Motion for Summary Judgment is GRANTED.   Damages are awarded in the amount of
$593,447.55 plus prejudgment interest.  A separate Order shall issue.

Date:  February 29, 2016

THEODORE D. CHUANG
United States District Judge